# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

Bradford L. Geyer, Esq
N.J. Id. No. 022751991
GeyerGorey LLP
2006 Berwick Drive
Cinnaminson, NJ 08077
(202) 374-0312
brad@geyergorey.com

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| UNITED STATES OF AMERICA and the | : | |
| STATES OF NEW JERSEY and NEW YORK, | : | |
| *ex rel.* KENNETH W. ARMSTRONG, | : | |
| | : | |
| Plaintiffs and Relator, | : | Civil Action No.:  12-cv-03319 |
| | : | |
| v. | : | **RELATOR'S SECOND AMENDED** |
| | : | **FALSE CLAIMS ACT COMPLAINT** |
| ANDOVER SUBACUTE AND REHAB | : | |
| CENTER SERVICES ONE, INC.; ANDOVER | : | **JURY TRIAL DEMAND** |
| SUBACUTE AND REHAB CENTER | : | |
| SERVICES TWO, INC, ESTATE OF DR. | : | |
| HOOSHANG KIPIANI; DR. SANJAY JAIN; | : | |
| and DR. BORIS FREYMAN, | : | |
| | : | |
| Defendants. | : | |

## <u>INTRODUCTION</u>

1. Plaintiff Kenneth W. Armstrong (the "Relator") brings this *qui tam* action on behalf of
   United States of America ("U.S."), the States of New Jersey and New York ("the
   States") (the U.S. and the States are sometimes referred to together as ("the
   Government") pursuant to the provisions of the Federal False Claims Act, 31 U.S.C. §§
   3729-3733 ("FCA"), and the False Claims Acts of the States against Defendants Andover
   Subacute and Rehab Center One, Inc., Andover Subacute and Rehab Center Two, Inc.

1

(together "Andover"), the Estate of Dr. Hooshang Kipiani and Dr. Sanjay

Jain (henceforth, together, "Defendants") to recover damages and civil penalties based

on the false claims for payment Defendants made and presented, and caused to be made

and presented, to the U.S. and the States.

2.  These violations arise out of Defendants' knowing submission of false and fraudulent

    claims for health care services, and their causing the submission of false and fraudulent

    claims for the provision of health care services to the U.S. and the States that were either

    not rendered, not rendered as described and claimed, not medically necessary or not

    lawfully authorized to be reimbursed by the U.S. or the States, as detailed below.

## FEDERAL JURISDICTION AND VENUE

3.  This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. §

    1331 and 31 U.S.C. § 3732. This Court has supplemental and pendant jurisdiction over

    the counts relating to the State of New Jersey False Claims Act, N.J.S.A. § 2A:32C-3(a)

    and New York False Claims Act, 2007 N.Y. Laws 58, Section 39, Article XIII §

    189(a), pursuant to 28 U.S.C. § 1367.  This Court has personal jurisdiction over

    Defendants pursuant to 31 U.S.C. § 3732(a) because one or more Defendants can be

    found in, reside in or transact business in this District. Additionally, this Court has

    personal jurisdiction over Defendants because acts prohibited by 31 U.S.C. § 3729

    occurred in this District, 31 U.S.C. § 3732(a).

4. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because one or more Defendants transacts business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

## PROCEDURAL ALLEGATIONS

5. To the extent, if any, that this case is deemed to be a "related action" and to the extent, if any, that facts set forth herein are deemed to be the same as facts underlying an existing *qui tam* FCA action pending at the time of the filing of this action, as set forth in 31 U.S.C. § 3730(e), said factual allegations in common with any pending action that would cause this case to be a related action are hereby expressly excluded from this action, but only to the limited extent necessary to avoid the statutory preemption.

6. Furthermore, to the extent that the allegations or transactions set forth herein are the subject of a civil suit or an administrative civil money penalty proceeding in which the U.S. is already a party, if any such proceedings exist, then the allegations or transactions referred to herein which are the subject of any such civil suit or administrative civil penalty proceedings are expressly excluded, but only for the specific time periods, specific companies and/or specific allegations or transactions that are already the subject of the civil suit and/or administrative civil money penalty proceeding.

7. On or about June 1, 2017, the United States submitted its "Notice of Election to Intervene in Part for Settlement Purposes and Decline Intervention in Part." Therein, the United States advised the Court that it had reached an agreement to settle the claims as to Dr. Boris Freyman ("Freyman") and was declining to intervene as to the remaining defendants: *i.e.*, the Estate of Dr. Hooshang Kipiani, Dr. Sanjay Jain, Andover Subacute

and Rehab Center Services One, Inc, and Andover Subacute and Rehab Center Services

Two, Inc. ("Remaining Defendants").

8. On or about June 8, 2017, the Court entered the Order dismissing claims against

Freyman, following the settlement of those claims. On September 21, 2017 upon

application of Relator, the Court unsealed the matter as to the Remaining Defendants.

## PARTIES

## RELATOR KENNETH W. ARMSTRONG

9. Relator Kenneth W. Armstrong is a resident of 15 Vail Drive, Newton, New Jersey

07860, County of Sussex, State of New Jersey.

10. From August 2002 until October 2011, Relator was employed by Andover as a patient

advocate. From January 2005 to October 2011, Relator also served as director of security

for Andover.

11. In October 2011, Relator was terminated from his employment at Andover on the basis of

Andover management's claimed need to reduce costs.

12. At all relevant times herein, Defendant Andover Subacute and Rehab Center Services

One, Inc. ("Andover Nursing Home") is New Jersey for-profit corporation with a

business address at 525 Riverside Avenue, Lyndhurst, New Jersey.

13. Andover One's President is Carla Turco Kipiani and its Secretary is Jerry Turco, Jr. Carla

Turco Kipiani and Jerry Turco, Jr. are siblings.

14. Andover Nursing Home operates Andover Subacute and Rehabilitation I ("Andover

Nursing Home"), a New Jersey-licensed Long-Term Care Facility doing business at 1

O'Brien Lane, Andover, New Jersey Andover Nursing Home is a 159-

bed nursing facility. Its patient population is comprised mainly of the elderly. The administrator of the Andover Nursing Home is Sonia Velmonte.

15. Defendant Andover Subacute and Rehab Center Services Two, Inc. ("Andover Rehab") is a New Jersey for-profit corporation with a business address at 525 Riverside Avenue, Lyndhurst, New Jersey

16. Andover Rehab's President is Carla Turco Kipiani and its Secretary is Jerry Turco, Jr.

17. Andover Rehab operates Andover Subacute and Rehabilitation II ("Andover Rehab"), a New Jersey-licensed Long-Term Care Facility doing business at 99 Mulford Road, Andover, New Jersey.

18. Andover Rehab is a subacute rehabilitation nursing facility that has 543 long-term care beds. Approximately 70% of the patients in Andover Rehab suffer from "behavioral" or "long-term psychiatric illness" requiring institutionalization. Most of the remaining patients in Andover Rehab suffer from Alzheimer's disease, other types of dementia or are sub-acute patients with limited alternatives. The last known administrator of Andover Rehab  was Cynthia Bradford. The majority of Andover Rehab's revenue comes from New York and New Jersey Medicaid patients.

19. Andover Nursing Home and Andover Rehab are referred to collectively hereafter as "Andover."

20. From 1964 until his death on or about  October 29, 2012 Dr. Hooshang Kipiani ("Kipiani") was a licensed physician authorized to practice medicine in New Jersey.

21. Dr. Kipiani was the husband of Andover One and Two's president, Carla Turco Kipiani.

22. Beginning at least as early as August 2002 until his death, Dr. Kipiani served as the Andover facilities' full-time Medical Director. As of October 2011, Dr. Kipiani was also the attending physician for an estimated hundreds of patients at the Andover facilities.

23. At all relevant times herein, Defendant Dr. Sanjay Jain was a physician practicing in Hackettstown, N.J.  He and his partner, Dr. Boris Freyman, over time, were also the attending physicians for estimated hundreds  of patients at the Andover facilities.

24. The Andover facilities house and provide medical care to patients that predominantly are residents of the States of New Jersey and New York and who are also Medicaid beneficiaries of these States.  In addition to Medicaid, some patients  receive Medicare beneficiaries based on age or some other qualifying disability.

## STATUTORY AND REGULATORY BACKGROUND

25. Medicaid is a federal health insurance system administered by the States and is available to low-income individuals and families that meet eligibility requirements determined by federal and State law. Medicaid pays for items and services pursuant to plans developed by the States and approved by the U.S. Department of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS"). See 42 U.S.C. §§ 1396a(a)-(b). States pay health care providers according to established rates; thereafter, the federal government reimburses the States a statutorily established share of "the total amount expended … as medical assistance under the States' plan." See 42 U.S.C. §§ 1396b(a)(1). In this matter Medicaid primarily pays Andover a per diem rate for patients who receive residential care at either of the Andover facilities.

26. Medicare was established in 1965 as part of the Social Security Act of 1965, 42 U.S.C. §§ 1395 et seq. ("Act"), to provide a federally funded health insurance program for the aged and disabled. HHS administers Medicare though CMS.

27. In this matter, Medicare Part B pays for non-routine medical care for patients at the Andover facilities, including physician services, which are central to the allegations herein. New York Medicaid also pays Andover a portion of the per diem rate for New York residents who are patients who receive residential care at either of the Andover facilities while New Jersey Medicaid pays a portion of the New Jersey residents at Andover.

28. Most patients at the Andover facilities are beneficiaries of Medicare, Medicaid , or both, depending on the nature of their disabilities, needs and deficits, and the nature of the health care services needed to care for them, in addition to other criteria

29. The Act mandates that nursing facilities, such as the Andover facilities, which participate in the Medicare and Medicaid programs, meet certain specific requirements to qualify for such participation. These requirements are set forth at 42 C.F.R. §§ 483.1, et seq., and "serve as the basis for survey activities for the purpose of determining whether a facility meets the requirements of participation in Medicare and Medicaid." 42 U.S.C. § 483.1.

30. Compliance with the specific requirements of 42 C.F.R. §§ 483.1, et seq., is a condition of federal funding. Among other things, to receive federal funding, a facility must provide the basic services enumerated in 42 C.F.R. §§ 483.1, et seq., including a quality of care necessary "to attain or maintain the highest practicable physical, mental, and psychosocial well being [of the patient]. . . ." 42 C.F.R. § 483.25.

31. Thus, in order to participate in the Medicare and Medicaid programs and to be eligible to receive payments from these programs, directly or indirectly, sxxxx like the Andover facilities must execute an agreement with HHS to abide by the conditions of participation in the Medicare and Medicaid programs. See 42 U.S.C. § 1395cc; 42 C.F.R. 483.1 et. seq.

32. Among other things, nursing facilities such as the Andover facilities, must provide quality assurance, utilization review, physician services, nursing services and pharmacy services to comply with the requirements of 42 C.F.R. §§ 483.1, 483.30, 483.40, 483.60 and 483.75.

33. Andover, like all nursing facilities, must sign a form agreement for the Medicaid program (Title XIX Medicaid) that is applicable to facilities specifically and requires that providers "comply with all applicable State and Federal Medicaid laws and policies, and rules and regulations promulgated pursuant thereto . . . ."

34. Physicians, like Dr. Kipiani and Dr. Jain, in order to be eligible for participation in the Medicare program, must certify on the Medicare enrollment form, CMS Form 855I, the "Certification Statement" that the medical provider signs states: "You MUST sign and date the certification statement below in order to be enrolled in the Medicare program. In doing so, you are attesting to meeting and maintaining the Medicare requirements stated below." Those requirements include: I agree to abide by the Medicare laws, regulations and program instructions that apply to me . . . . The Medicare laws, regulations and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including,

but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.   I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

35. The Medicare and Medicaid programs are hereinafter referred to as "Government Healthcare Programs."

36. The FCA, a civil statute, imposes liability for treble damages and civil penalties on anyone who "knowingly presents, or causes to be presented [to the U.S.] a false ... claim for payment or approval." 31 U.S.C. § 3729(a)(1). The definition of "knowingly" includes acting in "deliberate ignorance" or "reckless disregard" of the truth or falsity of the information. Id. § 3729(b). In addition, the U.S. may seek up to and in excess of $20,000  in penalties for each false claim. Id. § 3729(a); 28 C.F.R. § 85.3(a)(9).

37. Similarly, as detailed below, Andover knowingly submitted, and/or caused to be submitted, false claims to Government Healthcare Programs for per diem residential care for skilled nursing facility services that were not eligible for payment or reimbursement, as described with particularity below.

## DETAILS OF THE SCHEME RELATED TO DR. KIPIANI AND DR. JAIN

38. As detailed below, beginning at least as early as 2004 and continuing until at least March 2012, and upon information and belief as to Dr. Kipiani through October 29, 2012 (the date of his death) and up and through 2013 for Dr. Jain, Dr.  Kipiani and Dr. Jain as well persons acting under their direction and control, have unlawfully implemented a scheme to fraudulently bill Government Healthcare Programs by (a) the submission false claims

to Government Healthcare Programs for physician services to patients at Andover that were not provided or not provided as described.

39. Similarly, as detailed below, Ando Federal law mandates that all patient in nursing facilities, such as Andover "must remain under the care of a physician." 42 C.F.R. § 483.40.

40. Nursing facility residents, like those in Andover, "must be seen" every "30 days for the first 90 days after admission, and at least once every 60 days thereafter." 42 C.F.R. § 483.40 (c) (1). Must be seen" means the resident's physician "must make actual face-to-face contact with the resident." Interpretive Guidelines § 483.40(c). These federally mandated visits "must be made by the physician personally." 42 C.F.R. § 483.40(c)3.The only exception to this rule, which does not apply to either Dr. Kipiani or Dr. Jain because . . . is that "[a]t the option of the physician, required visits in SNFs after the initial visit may alternate between personal visits by the physician and visits by a physician assistant, nurse practitioner, or clinical nurse specialist … ." 42 C.F.R. § 483.40(c)3.Beginning at least as early as 2006 until his death in 2011, Dr. Kipiani  was employed by Andover as its Medical Director. During that period, Dr. Kipiani was also the attending physician for hundreds of patients at  Andover Rehab and Andover Nursing Home. []

41. As the attending physician to numerous patients at Andover, Dr. Kipiani was required to perform physician visits mandated by 42 C.F.R. § 483.40 to his Andover patients.

42. From at least 2010 until 2017 Dr. Jain was the attending physician for dozens of patients at Andover.  []

43. As the attending physician to numerous patients at Andover, Dr. Jain was required to perform physician visits mandated by 42 C.F.R. § 483.40 to his Andover patients.

44. From at least 2009 until Dr. Kipiani's death, Dr. Kipiani and Dr. Jain (along with settling co-defendant Freyman) were responsible for the majority of the 543 residents at Andover Rehab and a great many of the residents at Andover Nursing Home.

45. As noted above, the Relator is a retired County police detective who worked as a patient advocate and director of security at Andover from August 2002 to October 2011. From as early as 2006 until the date the he left Andover in October 2011, Relator, personally observed the behavior of Drs. Kipiani and Jain as described below. Based on his observations, as supplemented by statements made to him by other Andover employees, Relator concluded that Drs. Kipiani and Jain statements submitted to CMS (Medicare and Medicaid) seeking reimbursement for services provided.

46. In his role as advocate and security director Relator's typical schedule was Monday to Friday, 8:00 a.m. to 4:00 p.m.  From 2006 until 2011, Relator's office was directly was directly adjacent to the office of Robert Mayer, Andover's Director of Operations. Mayer and Dr. Kipiani were longtime friends.

47. Since in and around 2006, Dr. Kipiani had a desk in Mr. Mayer's office and largely used that desk Mr. Mayer's office to engage in this unlawful conduct.

48. The Relator shared his office with Andover's quality assurance director Coleen Baxter (discussed below).   Each day he came to Andover, Dr. Kipiani had to walk through Relator and Baxter's office to get to Mayer's office.

49. Given Relator's proximity to where Dr. Kipiani conducted his day to day activities, this vantage point permitted the Relator to personally observe Dr. Kipiani's routine and customary practice with respect to this scheme.

50. For example, from as far back as 2008 through October 2011 (when Relator left Andover Relator personally observed that Dr. Kipiani would come to his office on just 1 or 2 days per week. (the sample Medicare claims records attached under seal confirm this frequency.).

51. Relator personally observed that Dr. Kipiani would arrive at approximately 9:00am usually leave no later than 1:30, on days that he would have lunch with Robert Mayer, Relator observed that Dr. Kipiani seldom, if ever, came to the facility on a weekend. (the sample Medicare claims records from 2011 to 2012 confirm that there was just a single visit on weekend to a Medicare patient – the other 293 Medicare claims for Dr. Kipiani were during the week.)

52. During the days that Dr. Kipiani would come to the Andover, Boy Mayer would request that patient charts be pulled and prepared in advance Dr. Kipiani's arrival.

53. For example, Coleen Baxter always began her day before 7:00am because she was part of the team that was given daily "overnight report" by the 11-7 nursing supervisors.  She recalls countless occasions during these meeting where Robert Mayer, would come to the door and state "The Doctor will be up, pull one wing".

54. Although Relator was not part of the "overnight report" meeting, he would hear Mr. Mayer alerting the nurses as to the fact that Dr. Kipiani and Dr. Jain were coming to the facility and see the chart cart being taken by a nursing supervisor from Dr Kipiani's office to the wings.

12

55. On mornings when Dr. Kipiani would be coming into the office, Relator recalls Bob Mayer would call contact one or more of the Andover unit nurse supervisors and advise them verbally that Dr. Kipiani was coming in.

56. Mayer would make this request in this manner, or in similar matter each time Dr. Kipiani or Dr. Jain would come to Andover.  The Nursing Supervisors to whom this request was made, included, but not limited to the following: Diane Novak First Floor Supervisor, Ann Drake, Second Floor Supervisor, Lisa McGuire, Second Floor Supervisor, Madeline Duran, Third Floor Supervisor and Francis Third Floor Supervisor.

57. The purpose Mr. Mayer's call was to alert the nurses that Dr. Kipiani and/or Dr. Jain would be coming so that their patient's charts could be pulled and prepared in advance of the doctor's arrival at Andover.

58. The charts were selected because, those patients were required to be "seen" every "30 days for the first 90 days after admission, and at least once every 60 days thereafter."  42 C.F.R. § 483.40 (c) (1)

59. Relator (and others) also observed the manner in which the charts were pulled and prepared.

60. As for Dr. Kipiani, once it was decided which of his patient's charts were to be pulled and prepared, that wing's nursing supervisor would grab a specific "chart cart" that was in Dr. Kipiani's office and bring that cart to the wing where the charts were to be pulled.

61. As for Dr. Jain, unlike Dr. Kipiani, he did not have is own office, instead his charts would be pulled and placed in on or more charting rooms. Specifically, to the best of the Relator's recollection, the charting room on the West hallway on the 2nd floor, South three hallway on the 3r floor and the East hallway on the 1st floor.

62. According to Baxter and Relator, either a nurse or staff member from the selected wing would be assigned to prepare a list of the patients who had not been "seen," according to Andover's patient charting records, by either Dr. Kipiani or Dr. Jain in the past 30 days. Using this list, the charts of all such patients would be pulled by nursing supervisors, unit (floor clerks) or other staff, placed on a cart and wheeled into the Dr. Kipiani's office or other the chart room that Dr. Jain would be using that day. (Relator and Baxter would each see Dr. Kipiani's list because it would later be used for billing)

63. Relator (and others) observed the manner in which the patient's charts were prepared by the nurses after they were pulled.

64. First, another staff member, either a nurse or a nursing supervisor, would "flag" specific pages in the charts that need to be reviewed and signed by Dr. Kipiani or Dr. Jain

65. The typical procedure at Andover was to "flag" these charts using a yellow sticky, or a "postIt" and, by physically clipping the page above the patient binder so that the pages can readily be seen by the doctor.

66. Relator (and others) note that it is not unusual for nurses to prepare a doctor's patient's charts in this fashion at Andover- however, unlike Dr. Kipiani and Dr. Jain, as is detailed below those other doctors would actually first or contemporaneously see and assess the patient and be charting information about the physician visit.

67. Relator (and others) observed Dr. Kipiani follow the above procedure for many years while he was employed at Andover and has confirmed that the procedure remains in place up and through the time of Dr. Kipiani's death in October 2012.

68. Relator (and others) observed Dr. Jain following this procedural until such time as he was alerted to the Government's investigation – believed to have been in 2015.

69.  pages of each patient chart that was required to be initialed or signed by a physician.

70. During the relevant time frame including 2009 through 2015, Ms. Arnetta Williams, (discussed more below) was a nursing unit clerk and has been employed at Andover for over 30 years.  As a unit clerk, she personally was assigned to pull and mark charts in the fashion described above. The chart pulling and preparation activity described above would occur each day that Dr. Kipiani or Dr. Jain would come to the Andover.

71. Both Relator and Baxter would personally observe the chart cart being pushed back into Dr. Kipiani's office with the designated patient charts prepared in this fashion as it would we wheeled through their office to get to Dr.  Kipiani   Relator and Baxter both would also see the charts for Dr. Jain placed in the charting room as set for the above.  The activity detailed above was also observed by Bob Mayer and Jackie Petrozelli who also shared an office with Relator and Baxter. This activity was personally observed by Ms. Williams and all of the Nursing Supervisors and any and all staff member who would walk past a chart room when Dr. Jain was "charting" or past Dr. Kipiani office when he was doing the same.

72. Relator and Baxter estimate that on average, there were 20 to 30 charts on the cart for Dr. Kipiani and the same amount in the chart room or Dr. Jain.

73. Each day, after arriving at the facility, Dr. Kipiani (in his office) and Dr. Jain (in the chart room) each would the go through these patients' charts, initialing or signing the flagged pages, including any previous verbal orders, any "consults" performed since the last patient visit by a specialist and any reports of laboratory tests performed.

74. Relator, Baxter and Williams (and likely all other staff)  observed that, once finished, the residents charts would be collected by a staff member, (placed on the

15

cart as to Dr. Kipiani, collected in the chart room as to Dr Jain) and

a Andover staff member would refiled.

75. Relator observed that, when charting, Dr. Kipiani would spend much of his time talking

and conversing with Mr. Mayer and occasionally other staff members, including the

Relator.

76. Relator observed that After the chart review, Dr. Kipiani would usually had lunch at the

facility with Dr. Robert Mayer, Sr., the staff pharmacist, before leaving the building for

the day.   As for Dr. Jain, Relator and Baxter observed he would leave Andover as soon

as his charts were completed.

77. As noted above, it was not unusual for patient's chart to be prepared in advance of a

doctor's arrival. However, following an initial review of their patient's chart, other

attending physicians would then go to see the patient in the patients room and perform

a physician visit with the patient. The other physicians would spend of average between

15 and 45 minutes –depending upon the patient's health. Then either

contemporaneous therewith or immediately following the other physicians would write a

progress note which would contain information such as any subjective complaints, any

objective findings concerning the patient's health, some note as to the doctor's

assessment of the patient and would write out a medical plan or no change based on

the provider's physical encounter with the patient.   During this encounter,

the physicians would also spend time speaking with the patients, asking questions, assess

needs, and the like.  The conduct of the other physicians was observed thousands of time

each day for the nearly ten years that the relator worked and the nearly 20 years that

Baxter worked.

78. During his tenure, Relator never personally observed Dr. Kipiani or Dr. Jain enter a resident's room for a physician visits. This contrasts with the hundreds if not thousands of occasions when he observed other attending physicians perform "physician visits" in patient's rooms.

79. Relator can only recall one or two times where he personally observed Dr. Kipiani or Dr. Jain attending to a patient – which occurred when the patient was in some medical distress and Dr. Kipiani or Dr. Jain was available to attend the patient.

80. During her tenure, Ms. Baxter never personally observed Dr. Kipiani or Dr. Jain enter a resident's room for a physician visits, except a perhaps for a medical emergency on a few occasions. This contrasts with the hundreds if not thousands of occasions when she observed other attending physicians perform "physician visits."

81. Instead, Baxter even recalls one time where she personally observed Dr. Kipiani even going into one of the patient wings which occurred, to the best of her recollection, in and around 2010 when Dr. Kipiani brought his son –who evidently had an interest in medicine – to Andover. When Dr. Kipiani attempted to get on to the wing he had to ask Baxter for the combination to the door – because he been on the floors so rarely, he did not know the door's combinations.

82. Though she cannot be certain she recalls that either Dr. Kipiani and Dr. Jain went into a patient's room to deal with some medical emergency. Again, this contrast with the thousands of times she has seen other providers going in and out of the patient rooms doing the physician visits for the other residents.

83. Similarly, Ms. Williams spoke at length with Relator and confirmed that for those charts she would personally pull for Dr. Kipiani or Dr. Jain, each would only chart as if he had done a physician visit, when in fact he had not done so.

84. Similarly, Ms. Williams confirm that she personally would see Dr. Kipiani's hand-written notes in resident's charts documenting physician visits even though no visit had occurred.

85. Further, Ms. Grace Lapinski who started at Andover Subacute in 1990, appointed, moved to nursing supervisor in 1995 and later became Assistant Director of Nursing confirmed the above conduct stating that Dr. Kipiani sits in his office daily and signs the patient charts, (i.e., physician orders, progress notes, and lab results and consults). She further stated that that the only time that Dr. Kipiani would actually perform a physician visits was on the rare occasion that a medical emergency presented itself. She stated that Dr. Kipiani does not make any attempts to see his patient. She further confirmed that Dr. Jain, who, according to her, had approximately 100 patients, does the "same thing" and "never personally meets "with his patients.

86. Further, during Baxter's 20-year tenure, she participated in countless conversation with many other staff members where it was openly discussed that Dr. Kipiani and Dr. Jain do not see their patients. Her conversations included numerous conversations with Robert Mayer, Director of Operations, who openly acknowledged that Dr. Kipiani and Dr. Jain were not seeing patients as is detailed above.

87. Although it was openly known that these doctors were not seeing patients, the conduct occurred for years unabated.  It was commonplace, open and obvious. Relator, Baxter, Lapinski and Williams (and likely all staff) believed it was pointless to complain– as

18

Dr. Kipiani was the husband of Carla Turco, the president and majority shareholder of Andover.

88. In fact, the only senior person who ever attempted to put a stop to this practice was Dr. Padmavathy Kurra, a psychiatrist who treated patients at Andover. She would frequently complain in meetings and to management about Dr. Kipiani and Dr. Jain not seeing the patients. In and around 2012 Dr. Kurra made a statement to Ms. Williams that she was going to make a formal report to the authorities that Dr. Kipiani and Dr. J were not performing the physicians visits but was instead filling out medical charts as if he had done so.

89. The above scheme began no later than 2009 and continued by Dr. Kipiani  unabated until his death; and continued by Dr. Jain up and until the date Dr. Jain was aware of the Government's investigation (believed to be in 2015). The scheme as detailed above resulted in the submissions of false claims detailed below.

## SCHEME DETAILS AS IT RELATES TO ANDOVER

90. Relator repeats and realleges each allegation contained above as if fully set forth herein.

91. Separate and apart from the physician visit scheme engaged in by Dr.  Kipiani and Dr. Jain detailed, during the same time frame, Andover also submitted false claims for each patient who were supposed to be under the care and supervision of Dr.  Kipiani and Dr. Jain.  These claims, referred to as "per diem" claim, is the amount that Andover charged Medicaid each day one of Dr.  Kipiani or Dr. Jain's patient was in Andover.

92. Medicaid per diem rates are calculated in part by the New York and New Jersey Departments of Health and consist of four components: the facility specific direct rate

component, which takes into account state average costs and the individual facility's

costs and total patient days; the fair rental value allowance, which reflects the facility's

age, re-aging, number of beds and depreciation; the facility's taxes; and a "budget

adjustment factor". Andover's claims for per diem payments were only made

to Medicaid as Medicare does not pay for long term nursing home care.  The per diem

rate is also based on Andover completing annual cost reports detailing the nature of the

care and the medical needs of the patients.

93. In order to receive these per diem payments from the Medicaid, Andover was first

required to sign several standard contracts with the Federal and State governments. First,

on the Federal side Andover was required to sign a contract with Secretary of the

Department of Health and Human Services ("HHS").

94. That contract is CMS Form 1561 "Provider Agreement." This agreement opens with the

language... "[i]n order to receive payment under title XVIII of the Social Security Act

[Andover] as the provider or services, agrees to conform to the provisions of section 1866

of the Social Security Act and applicable provision in 42 CFR.

95. Next, with respect to Medicaid, Andover was also required to sign a contract with New

Jersey Department of Health and Senior Services ("NJDHSS"). That contract is NJ Form

P-2 "Provider Agreement." That Provider Agreement opens with the language that states

the following: "PROVIDER AGREES:  1. To comply with all applicable State and

Federal Medicaid laws and policies, and rules and regulations promulgated pursuant

thereto...

96. Hence, the provider agreements signed by Andover creates a binding obligation by it to

comply with the regulations governing long term care facilities found at 42 U.S.C. §

20

483.1, et. seq. and the State equivalents.   Importantly, those regulations include the following:

97. Federal law mandates that all patient in nursing facilities, like Andover, "must remain under the care of a physician." 42 C.F.R. § 483.40.

98. That care includes "physician supervision" to "ensure that…that the medical care is supervised by physician; and another physician supervises the medical care of residents when their attending physician is not available." 42 C.F.R. § 483.40(a)

99. "Supervising the medical care of residents" means participating in the resident's assessment and care planning, monitoring changes in resident's medical status, and providing consultation or treatment when called by the facility. It also includes, but is not limited to, prescribing new therapy, ordering a resident's transfer to the hospital, conducting required routine visits or delegating and supervising follow-up visits to nurse practitioners or physician assistants." Interpretive Guidelines §483.40.

100.    Facilities, like Andover, are mandated by federal regulations to provide its residents with periodic "physician visit[s]."42 C.F.R. § 483.40(b).

101.    The intent of this regulation is to have the physician take an active role in supervising the care of residents. This should not be a superficial visit but should include an evaluation of the resident's condition and a review of and decision about the continued appropriateness of the resident's current medical regime. Interpretive Guidelines §483.40(b)

102.    Nursing facility residents, like those in Andover, "must be seen" every "30 days for the first 90 days after admission, and at least once every 60 days thereafter."  42 C.F.R. § 483.40 (c) (1)

103.     "Must be seen" means the resident's physician "must make actual face-to-face contact with the resident." Interpretive Guidelines § 483.40(c).

104.     These federally mandated visits "must be made by the physician personally." 42 C.F.R. § 483.40(c)3

105.     The only exception to this rule requiring the physician to personally see the resident is "[a]t the option of the physician, required visits in SNFs after the initial visit may alternate between personal visits by the physician and visits by a physician assistant, nurse practitioner, or clinical nurse specialist …" 42 C.F.R. § 483.40(c)3

106.     This exception does not apply here, as neither Dr. Kipiani or Dr. Jain utilized a physician assistant, nurse practitioner, or clinical nurse specialist.

107.     Similarly, under N.J.A.C. § 8:85-2.3 Physician services

(a)  General requirements for physician services shall be as follows:

1.  Each Medicaid beneficiary's care shall be under the supervision of a New Jersey licensed attending physician chosen by, or agreed to by, the Medicaid beneficiary, or if the beneficiary is incompetent, by the family or legal guardian.

2.  The attending physician shall also be responsible for initial and ongoing medical evaluation, as follows:

i.  The medical assessment of the Medicaid beneficiary shall begin at the time of admission to a NF and shall be the foundation for the planning, implementation, and evaluation of medical services directed toward the care needs of the resident.

ii.  The medical assessment shall consist of the complete, documented, and identifiable appraisal (from the time of admission to discharge) of the Medicaid beneficiary's current physical and psychosocial health status. The medical assessment shall be utilized to determine the existing and potential requirements of care. The evaluation of the data obtained from the medical assessment shall lead to the development of the medical services portion of the interdisciplinary care plan. The assessment data shall be available to all staff involved in the care of the resident

22

….

5.  Physician visits shall be conducted as follows:

i.  All required physician visits shall be made by the physician personally, or a physician assistant or nurse practitioner, as permitted by State law.

[…]

(1)  For the first 90 days, the Medicaid beneficiary shall be visited and examined every 30 days. Thereafter, with written justification, the interval between visits may be extended for up to 60 days.

(2)  Additional visits shall be made when significant clinical changes in the Medicaid beneficiary's condition require medical intervention.

[….]

108.     As noted above, Robert Mayer, Andover's director of operations personally was aware that both Dr.  Kipiani and Dr. Jain (as is detailed above) were not seeing their patients.

109.     As Director of Operations, he met regularly with Ms. Carla Turco Kipiani (the wife of the late Dr.  Kipiani and Andover Adminstrator's about all operational matters of Andover.

110.      As Director of Operations he was fully aware of the patient census and the names of the patient's that were assigned to Dr.  Kipiani and Dr. Jain.

111.     Baxter recalls conversations with Mayer, in and around 2010 and 2011, pertaining the need for Mayer to find additional physicians who could come to care for patients at Andover because Dr.  Kipiani and Dr. Jain could not manage (i.e., keep up with) the number of charts they were documenting, even without actually seeing the patients.

112.     In the conversations, she recalls particularly Mayer being concerned about Dr. Kipiani who in 2011 was in his 80's.

113.     As to each of Dr. Kipiani and Dr. Jain's patients, Mayer personally knew that those patients were required to be "seen" every "30 days for the first 90 days after admission, and at least once every 60 days thereafter." (42 C.F.R. § 483.40 (c) (1)). He specifically would tell the nursing supervisors to pull specific charts so that Dr. Kipiani and Dr. Jain would write documentation in the chart as if they were seeing the patient, even though Mayer knew they were not.

114.     As to each of Dr. Kipiani and Dr. Jain's patients, Mayer personally knew that those Andover residents were not "under the care of a physician" (42 C.F.R. § 483.40) because he knew that Dr. Kipiani and Dr. Jain were not seeing those patients.

115.     As to each of Dr. Kipiani and Dr. Jain's patients, Mayer personally knew that care others were given to these patients was not under the required "physician supervision." (42 C.F.R. § 483.40(a))

116.     Notwithstanding the above, Mayer continued to authorize Andover to make per diem claims to Medicaid for these residents.

117.     Although in its provider agreement, Andover knew that in "[i]n order to receive (per diem) payment (for the patients) under title XVIII of the Social Security Act "it was required to have these patients seen by their doctors, it submitted per diem claims for these patients which were later paid for by Medicaid.

118.     That the care of a patient under a physician is material to the government's decision to pay is self-evident given the mandatory federal regulations regarding physician supervisions set forth above.

119.     The above scheme by Andover began no later than 2009 and continued

by Andover for Dr. Kipiani's patients unabated until Dr. Kipiani's death; and continued

by Andover as to Dr. Jain's patients up and until the date Dr. Jain was aware of the

Government's investigation (believed to be in 2015). The scheme as detailed above

resulted in the submissions of false claims detailed below

## DETAILS AS TO CLAIMS BY ANDOVER, DR.  KIPIANI AND DR. JAIN BEING SUBMITTED AND PAID FOR BY MEDICARE AND MEDICAID

120.     Andover, Dr. Kipiani and Dr. Jain, like all providers of health care services

seeking reimbursement under Medicare and Medicaid must also submit a paper or an

electronic claim approved by the National Uniform Claim Committee in August of 2005.

That is CMS 1500 or "Health Insurance Claim Form."

121.     These forms are primary way that providers like Andover, Dr. Kipiani and Dr.

Jain seek payment for services from Medicaid.

122.     When submitting claims for payment, providers like, Andover, Dr. Kipiani and

Dr. Jain must complete section 24A-J which identifies the precise services for which

payments are being sought and the dates on which those services were provided.

123.     The form contains a "SIGNATURE OF PHYSICIAN OR SUPPLIER

(MEDICARE, CHAMPUS, FECA AND BLACK LUNG)" and the following

certification:

I certify that the services shown on this form were medically indicated and necessary for
the health of the patient and were personally furnished by me or were furnished-incident
to my professional service by my employee under my immediate personal supervision…

25

124.     Further, a signing provider certifies that: "Notice: This is to certify that the foregoing information is true and accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds and any false claims, statements or documents or concealment of a material fact will be prosecuted under the applicable Federal and State Law"

125.     Pursuant to Government Healthcare Program requirements, in order to be paid for per diem claims and the physician visit claims, Andover, Dr. Kipiani and Dr. Jain or a person acting under the physician's or Andover's direction, must submit a claim for payment to the appropriate Governmental Healthcare Program, or fiscal intermediary. As is set forth above at least as early as 2006, up to and including at least March 2012, (and upon information of Ms. Williams, and Grace Lipinski)– beyond) Dr. Kipiani and Dr. Jain with the knowledge, acquiescence, and active assistance of Andover personnel, have routinely and systematically submitted, and caused to be submitted, to Government Healthcare Programs, or their fiscal intermediaries, false claims certifying that they had performed required patient visits when, in fact, they had not.

126.     Claims to Medicare for Dr. Kipiani and Dr. Jain physician visits were submitted on claim form CMS-1500 form. This form is generally submitted electronically. As completed, the CMS-1500 must contain sufficient information for the approving agency to determine whether payment is due and, if so, in what amount. 42 C.F.R. § 424.5(a)(5)-(6); 42 C.F.R. § 424.32.

127.

128.     Dr. Kipiani and Dr. Jain submitting these false claims for an "initial" physician visit for a nurse facility resident, section 24D from the CMS Form 1500 was

completed using Healthcare Common Procedure Coding/Current Procedural

Terminology, ("CPT") code 99304, 99305, and/or 99306. Only a physician may

report these codes for an initial federally mandated visit performed in a nursing facility

like Andover.

129.     When Dr.  Kipiani and Dr. Jain submitted claims for physician visit after the

initial physician visit of a nurse facility resident, section 24D from the CMS Form

1500 was completed using CPT code, 99307, 99307, 99309, and or 99310.

130.     Similarly, per diem claims submitted to New Jersey Medicaid for Andover

patients of Dr. Kipiani and Dr. Jain were submitted by Andover to the New Jersey

Department of Human Services Division of Medical Assistance and Health using a Long

Term Care Turnaround Document ("TAD").  This claim form, an example of which is set

out below, is submitted by all New Jersey nursing facilities, including Andover for each

patient's per diem care.



131.

In addition, Andover when submitting these per diem claims must also complete and sign
a Provider Certification Statement stating the following: I CERTIFY THAT THE
FOREGOING INFORMATION IS TRUE, ACCURATE AND COMPLETE AND
THAT […] PATIENTS FOR WHOM PAYMENT IS REQUESTED WERE PROVIDED
NURSING CARE IN THOSE AREAS ONLY OF THIS FACILITY WHICH ARE
CERTIFIED FOR PARTICIPATION IN THE NEW JERSEY MEDICAID PROGRAM.
I ALSO CERTIFY THAT FOR EACH MEDICAID PATIENT, A PHYSICIAN, HAS
ESTABLISHED/REVISED. A WRITTEN PLAN OF CARE AND
CERTIFIED/RECERTIFIED, IN WRITING, THE NEED FOR NURSING CARE IN

ACCORDANCE WITH N.J.A.C. 10:61-1.5. I FURTHER CERTIFY THAT[…]THE
SERVICES COVERED BY THIS CLAIM AND THE AMOUNT CHARGED
THEREFORE ARE IN ACCORDANCE WITH THE REGULATIONS OF THE NEW
JERSEY MEDICAID PROGRAM …"

132.     In addition, Andover must certify that:

UNDERSTAND THAT FRAUD OR CONCEALMENT WILL BE PUNISHABLE
UNDER APPLICABLE FEDERAL OR STATE LAW OR BOTH AND THAT THE
FACILITY IS NOT ELIGIBLE FOR PAYMENT WITHOUT TIMELY RECEIPT OF
THIS CERTIFICATE

133.     This Certification must be signed by the Andover's Administrator or by an

Officer of the Facility.

134.     Similarly, per diem claims submitted to New York Medicaid for Andover patients

of Dr. Kipiani and Dr. were submitted by Andover using a UB-04 paper or electronic

claim form. This form, an example of which is set out below, is sent by all nursing

facilities, for New York Medicaid patient's per diem care.



135.     When Andover submitted this claim form to New York Medicaid, it certified on

the form that:

UB-04 NOTICE: THE SUBMITTER OF THIS FORM UNDERSTANDS THAT
MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS

28

REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).

136.     In addition, when submitting this claim form, Andover further certified on the

form that:

Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete.  That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.

For Medicaid purposes: The submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State Laws.

137.     New Jersey Medicaid claims are submitted to Molina Medicaid Solutions who

acts a fiscal intermediary for New Jersey.

138.     New York Medicaid claims are submitted to directly to New York Medicaid in

Rensselaer, NY 12144-4601.

139.     Relator does not know the identity of Andover's billing personnel who would

have submitted these claims to New York or New Jersey Medicaid.

140.     Andover director of admissions, Adele Primiano, prior to the death of Dr.

Kipiani, pursuant to his instruction, and, upon information and belief, with full

knowledge of Andover's management, would complete the CMS-1500 form for Dr.

Kipiani's patients to show that a patient visit occurred, inserting on the CMS-1500 the

required billing code, and would submit the false claim for payment to the appropriate

Government Healthcare Program, or its fiscal intermediary.

141.     It is unknown who at Dr Jain's office would complete and submit his CMS

1500 false claim form for payment.

29

## EXAMPLES OF ACTUAL MEDICARE CLAIMS
## SUBMITTED BY DR. KIPIANI AND DR. JAIN

142.     As part of Relator's investigation, Medicare Part B claims data has been obtained

from United States Department of Health and Human Services and/or the Center for

Medicare and/or Medicaid Services for 2011, 2012 and 2013. (Data from additional years

will be forthcoming)

143.     That Medicare Part B data reveals that between January 4, 2011 and September 6,

2012 Dr. Kipiani submitted 294 for Medicare claims for "physician visits" (i.e., CPT

Code 99305, 99308 or 99309) which were paid for by Medicare. (The full and complete

list of claims, including dates, amounts, and other details will be made in a sealed

filing to this SAC as these claims contained Protected Health Information including

patient names.)

144.     Similarly, that Medicare Part B data reveals that between January 1, 2011

and December 31, 2013 Dr. Jain submitted 3119 Medicare claims for "physician visits"

(i.e., CPT Code 99304, 99305, 99307, 99308, 99309 or 99315) which were paid for by

Medicare. (The full and complete list of claims, including dates, amounts, and other

details will be made in a sealed filing to this SAC as these claims contained Protected

Health Information including patient names.)

145.     Each of these patients were also either a New Jersey or New York Medicaid

beneficiary and Andover would submit per diem claims for each day that the patient

remained in Andover.


**RELIABLE INDICIA THAT CLAIMS WERE SUBMITTED AND PAID FOR BY N.Y.
MEDICAID AND N.J. MEDICAID**

146.     Unlike the Medicare claims data example in the previous section, Relator has not yet obtained Medicaid claims for claims submitted by Andover, Dr.  Kipiani and Dr. Jain

147.     Upon information and belief, (based on below) in addition to the Medicare claims set forth in the previous section  Dr.  Kipiani and Dr. Jain submitted claims for physician visits to N.Y. and N.J. Medicaid.

148.     Upon information and belief, (based on below) in addition to the claims set forth in the previous section Andover submitted per diem claims for patients of Dr. Kipian and Dr. Jain.

149.

150.     This information and belief is based on Baxter's understanding of Andover's operations based on her 20 years of experiences.

151.     First, as part of Baxter's job duties, she would be on all floors and wings and would see the charts prepared in the fashion described. Baxter could readily determine whether a patient insurance was Medicare, commercial insurance, N.J. Medicaid, N.Y. Medicaid and/or dual eligible.

152.     She was able to make these determinations in part, because she was very familiar with the Andover business operations – having first worked at Andover's business office when she started in 1991.

153.     Further, she was fully aware and could easily determine Dr.  Kipiani and Jain's patient's coverage and could identify whether a patient had Medicare, N.J. Medicaid or N.Y. Medicaid based on the patient identification numbers – which are different under each of the various programs.

154.     During her time as quality assurance director, Baxter was also familiar with the

payers because Andover, as a licensed nursing facility, was require to undergo annual on-

site inspections by the New Jersey Department of Health.  (Baxter believes that given the

number of N.Y. Medicaid patients at Andover, that New York also performed

inspections).  As such, Baxter was involved in preparing and managing aspects

of Andover annual surveys and inspection.

155.     As part of the surveys and inspections, Baxter she would review the facility, the

food, the staff, the patient's rooms, clinical matters, and all aspects of Andover's

operations.

156.     Further, as part of her duties, she also saw lists of patients (called the "census")

and information about the patients including their home State and insurance carrier (i.e.,

Medicare, N.Y. Medicaid, N.J. Medicaid and dual eligible).

157.     She recalls that the majority of the patients were N.Y. Medicaid, followed by N.J.

Medicaid, followed by Medicare – very few patients were privately insured.

158.     Further, in and around 2009, Andover was criticized by a state inspection for the

patient's doctors not properly documenting medical information in

patient's charts. Baxter was then assigned by management the responsibility to make sure

that clinical staff who treated patients in Andover (including Dr.  Kipiani and Dr Jain)

were properly writing and documenting full and complete medial information into the

patient's charts.

159.     In that capacity, Ms. Baxter would read medical notations that had just

been written into charts by Dr.  Kipiani and Dr. Jain. In doing so, she would plainly see

that the Dr.  Kipiani and Dr. Jain provided would write in the chart that they had

performed an actual face to face visit with a patient where none had actually taken place. She would see notations from the Dr. Kipiani noted patients being "Alert and Oriented" and notes about physical examinations – even though Dr. Kipiani and Dr. Jain had not seen the patient.

160.    Importantly, these charts would clearly indicate the patient's insurance carrier and Baxter saw that the majority of Dr. Kipiani and Dr. Jain's patients were covered by Medicaid and Medicare.

161.    Based on her years of experience and the reviews of Dr. Kipiani and Dr. Jain's charts and the census, she estimates that most of Andover's patients were covered by N.Y. Medicaid, followed by N.J. Medicaid and then Medicare.

162.    Baxter's estimate is consistent with Andover Rehab 543 patient mix since approximately 70% of the patients in Andover Rehab suffer from "behavioral" or "long-term psychiatric illness" requiring institutionalization. Andover Rehab patients, unlike Andover Nursing Home, were far younger and therefore would not automatically qualify for Medicare based on age – thus Medicaid would be their primary coverage source.

163.    Baxter was in countless operation meetings were Andover's "Medicaid" revenue from its residents was discussed as Medicaid revenue from the per diem claims accounted for the vast majority of Andover's revenue. (The current rate is nearly $190 per day per patient which revenue would exceed $40 Million dollars per year for the nearly 600 patients at Andover.)

164.    Baxter was in countless meetings where Mayer discussed the need to increase the "census" and thereby increase Medicaid per diem revenue.

33

165.     Baxter also was in countless meeting where marketing to New York patients who were covered by Medicaid was discussed – with the goal to bring in more New York patients who were covered by Medicaid.

166.     Neither Baxter (nor the Relator) even heard Mayer or anyone else at Andover state words to the effect that Andover was "not" billing per diem claims for Dr.  Kipiani and Jain's patients.

167.     Further a published document entitled from the Social Security Administration SI NY01410.020 Process for Determining the State and County of Residence – State Placement (RTS 402 -- 09/2006) identifies Andover Rehab as a one of the "common facilities where individuals are place by New York."

(https://secure.ssa.gov/poms.nsf/lnx/0501410020NY

168.     Baxter made additional observations which make clear that claims were submitted by Dr. Jane and Dr. Kipiani for N.Y. and N.J. Medicaid. As noted above, Adele Primiano was a long-term assistant for Dr.  Kipiani and was responsible for his billing of physician visits. After charting for physician visits that he would *not* perform, Baxter (and Relator) would observed that Dr. Kipiani would then complete a list of patients to give to Ms. Primiano would then prepare the billing and claim form. For example, if 20 patient charts (including those covered by N.Y. and N.J. Medicaid) were on the cart and wheeled into Dr. Kipiani, a list of 20 patients to bill would be given to Adel when the charting was complete. Further, Baxter could also see patient names and other information demonstrating that patients were covered by Medicaid and Medicare.

169.     Although they did not work in the billing departments, neither Baxter nor Relator have any reason to believe that Andover(per diem claims), Dr. Kipiani or Dr. Jain

34

(physician visit claims) did not submit claims to N.J. Medicaid and N.Y. Medicaid in the manner noted above. As part of Relators investigation, a subpoena to N.J. Department of Health has been issued and Medicaid Claims data representing claims for Dr. Kipiani and Dr. Jain will be forthcoming. Similar, a subpoena for N.Y. Medicaid claims data will be forthcoming.  This subpoena will also return all per diem claims submitted by Andover for each of Dr. Kipiani and Dr. Jain's patient during the relevant time period

## COUNT ONE

## (VIOLATION OF THE FALSE CLAIMS ACT -- 31 U.S.C. § 3729(a)(1)(A)) -THE ESTATE OF DR. KIPIANI AND DR. JAIN

170.       Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

171.       The Doctors knowingly presented, or caused to be presented, false and fraudulent claims for services that were either not rendered, not rendered as described and claimed, not medically necessary or were not eligible for reimbursement for payment or approval to the Governmental Healthcare Programs, in violation of 31 U.S.C. § 3729(a)(1)(A).

172.       Said false and fraudulent claims were presented with the actual knowledge by the Doctors of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

173.       The U.S. relied on these false and fraudulent claims, were ignorant of the truth regarding these claims and would not have paid Defendants for these false and fraudulent claims had they known the falsity of the said claims.

174.     As a direct and proximate result of the false and fraudulent claims made

by Defendants, the U.S. has suffered damages and therefore are entitled to recovery as

provided by the FCA for each such violation.

WHEREFORE, Relator respectfully requests this Court to enter judgment against

Defendants, as follows:

(a)     That the U.S. be awarded damages in the amount of three times the damages sustained by the U.S. … because of the false claims and fraud alleged within this Complaint, as the FCA, 31 U.S.C. §§ 3729, *et seq*., provides;

(b)     That civil penalties of $11,000 be imposed for each and every false claim that Defendants presented to the United States;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the FCA for which redress is sought in this complaint;

(e)     That the Relator be awarded the maximum amount allowed to him pursuant the FCA; and

(f)     That this Court award such other and further relief as it deems proper.

## **COUNT TWO**

## **(VIOLATION OF THE FALSE CLAIMS ACT -- 31 U.S.C. § 3729(a)(1)(B)) -THE ESTATE OF DR. KIPIANI  AND, DR. JAIN**

175.     Relator incorporates by reference and re-alleges all paragraphs of this Complaint

set forth above as if fully set forth herein.

176.    The Doctors knowingly made, used or caused to be made or used, false records or false statements material to the foregoing false or fraudulent claims to get these false or fraudulent claims paid and approved by the Governmental Healthcare Programs, in violation of 31 U.S.C. § 3729(a)(1)(B).

177.    The Doctors knowingly used false records or false statements that were material, and on information and belief continue to be material, to the false and fraudulent claims for payments they made to the U.S. for reimbursements and benefits.

178.    The Doctors' materially false records or false statements are set forth above and include, but are not limited to false claims and/or bills for payment that explicitly and/or impliedly attested that their patients were eligible to receive long-term care services when in fact they were ineligible or billed for ineligible services

179.    These said false records or false statements were made, used or caused to be made or used, with the Doctors' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

180.    As a direct and proximate result of the false and fraudulent claims made by Defendants, the U.S. has suffered damages and therefore is entitled to recover as provided by the FCA for each such violation.

WHEREFORE, Relator respectfully requests this Court to enter judgment against Defendants, as follows:

    (a)    That the U.S. be awarded damages in the amount of three times the damages sustained by the U.S. … because of the false claims and fraud alleged within this complaint, as the FCA, 31 U.S.C. §§ 3729, *et seq*. provides;

        (b)    That civil penalties of $11,000 be imposed for each and every false claim that defendant presented to the United States;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the FCA for which redress is sought in this complaint;

(e)     That the Relator be awarded the maximum amount allowed to him pursuant the FCA; and

(f)     That this Court award such other and further relief as it deems proper.

## COUNT THREE

## (VIOLATION OF THE FALSE CLAIMS ACT -- CONSPIRACY TO SUBMIT FALSE CLAIMS 31 U.S.C. § 3729(a)(1)(C)) -THE ESTATE OF DR. KIPIANI, DR. JAIN AND ANDOVER

181.     Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

182.     Defendant Andover conspired and agreed with the Doctors to defraud Governmental Healthcare Programs as alleged in Count One and Count Two above.

183.     As a direct and proximate result of the false and fraudulent claims made by Defendants, the U.S. has suffered damages and therefore are entitled to recovery as provided by the FCA for each such violation.

WHEREFORE, Relator respectfully requests this Court to enter judgment against Defendants, as follows:

(a)     That the U.S. be awarded damages in the amount of three times the damages sustained by the U.S. … because of the false claims and fraud alleged within this complaint, as the FCA, 31 U.S.C. §§ 3729, *et seq*. provides;

(b)     That civil penalties of $11,000 be imposed for each and every false claim that defendant presented to the United States;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the FCA for which redress is sought in this complaint;

(e)     That the Relator be awarded the maximum amount allowed to him pursuant the FCA; and

(f)     That this Court award such other and further relief as it deems proper.

## COUNT FOUR

## (VIOLATION OF THE FALSE CLAIMS ACT -- 31 U.S.C. § 3729(a)(1)(A)) BY ANDOVER

184.     Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

185.     Andover knowingly presented, or caused to be presented, false and fraudulent claims for services that were not eligible for reimbursement for payment or approval to the Governmental Healthcare Programs in violation of 31 U.S.C. § 3729(a)(1)(A).

186.     Said false and fraudulent claims were presented by Andover with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

187.     The U.S. relied on these false and fraudulent claims, was ignorant of the truth regarding these claims, and would not have paid defendants for these false and fraudulent claims had it known the falsity of the said claims by defendants.

188.     As a direct and proximate result of the false and fraudulent claims made by Defendants, the U.S. has suffered damages and therefore are entitled to recover as provided by the FCA for each such violation.

WHEREFORE, Relator respectfully requests this Court to enter judgment against

Defendants, as follows:

(a)     That the U.S. be awarded damages in the amount of three times the damages sustained by the U.S. … because of the false claims and fraud alleged within this complaint, as the FCA, 31 U.S.C. §§ 3729, *et seq.* provides;

(b)     That civil penalties of $11,000 be imposed for each and every false claim that defendant presented to the United States;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the FCA for which redress is sought in this complaint;

(e)     That the Relator be awarded the maximum amount allowed to him pursuant the FCA; and

(f)     That this Court award such other and further relief as it deems proper.

## COUNT FIVE
## (VIOLATION OF THE FALSE CLAIMS ACT -- 31 U.S.C. § 3729(a)(1)(B)) ANDOVER

189.     Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

190.     Andover knowingly made, used or caused to be made or used, false records or false statements material to the foregoing false or fraudulent claims to get these false or fraudulent claims paid and approved by the Governmental Healthcare Programs in violation of 31 U.S.C. § 3729(a)(1)(B).

191.     Andover knowingly used false records or false statements that were material, and on information and belief continue to be material, to the false and fraudulent claims for payments they made to the U.S. for reimbursements and benefits.

192.     Andover's materially false records or false statements are set forth above and include, but are not limited to false claims and/or bills for payment that explicitly and/or impliedly attested that their patients were eligible to receive long-term care services when in fact they were ineligible or billed for ineligible services

193.     These said false records or false statements were made, used or caused to be made or used, with Andover's actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

194.     As a direct and proximate result of the false and fraudulent claims made by Defendants, the U.S. has suffered damages and therefore are entitled to recovery as provided by the FCA for each such violation.


WHEREFORE, Relator respectfully requests this Court to enter judgment against Defendants, as follows:


(a)     That the U.S. be awarded damages in the amount of three times the damages sustained by the U.S. … because of the false claims and fraud alleged within this complaint, as the FCA, 31 U.S.C. §§ 3729, *et seq*. provides;

(b)     That civil penalties of $11,000 be imposed for each and every false claim that defendant presented to the United States;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the FCA for which redress is sought in this complaint;

(e)     That the Relator be awarded the maximum amount allowed to him pursuant the FCA; and

(f)     That this Court award such other and further relief as it deems proper.

## COUNT SIX
## (VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT -- N.J.S.A. § 2A:32C-3(a)) - THE ESTATE OF DR. KIPIANI AND, DR. JAIN

195.    Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

196.    The Doctors knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the State of New Jersey in violation of N.J.S.A. § 2A:32C-3(a).

197.    Said false and fraudulent claims were presented with the Doctors' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

198.    The State of New Jersey relied on these false and fraudulent claims, was ignorant of the truth regarding these claims, and would not have paid Defendants for these false and fraudulent claims had it known the falsity of the said claims by Defendants.

199.    As a direct and proximate result of the false or fraudulent claims, the State of New Jersey suffered damages and therefore is entitled to recover from the Doctors treble damages under the New Jersey False Claims Act, in an amount to be proved at trial, plus a civil penalty of not less than and not more than the civil penalty allowed under the New Jersey False Claims Act.

WHEREFORE, Relator respectfully requests this Court to enter judgment against Defendants, as follows:

(a)     That the U.S. be awarded damages in the amount of three times the damages sustained by the U.S. … because of the false claims and fraud alleged within this complaint, as the FCA, 31 U.S.C. §§ 3729, *et seq*. provides;

(b)     That civil penalties of $11,000 be imposed for each and every false claim that defendant presented to the United States;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the FCA for which redress is sought in this complaint;

(e)     That the Relator be awarded the maximum amount allowed to him pursuant the FCA; and

(f)     That this Court award such other and further relief as it deems proper.

## COUNT SEVEN
## VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT -- N.J.S.A. § 2A:32C-3(b)) - THE ESTATE OF DR. KIPIANI AND DR. JAIN

200.     Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

201.     The Doctors knowingly made, used or caused to be made or used, false records or false statements material to the foregoing false or fraudulent claims to get these false or fraudulent claims paid and approved by the State of New Jersey, in violation of N.J.S.A. § 2A:32C-3(b).

202.     The Doctors' knowingly false records or false statements were material, and on information and belief continue to be material, to the false and fraudulent claims for payments they made to the State of New Jersey for Medicaid reimbursements and benefits.

203.    The Doctors' materially false records or false statements are set forth above and include, but are not limited to false claims and/or bills for payment that explicitly and/or impliedly attested that their patients were eligible to receive long-term care services.

204.    These said false records or false statements were made, used or caused to be made or used, with the Doctors' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

205.    As a direct and proximate result of these materially false records or false statements, and the related false or fraudulent claims made by the Doctors, the State of New Jersey has suffered damages and therefore is entitled to recovery as provided by the New Jersey False Claims Act in an amount to be determined at trial, plus a civil penalty of not less than and not more than the civil penalty allowed under the New Jersey False Claims Act.

WHEREFORE, Relator respectfully requests this Court to enter judgment against  Defendants, as follows:

(a)    That the U.S. be awarded damages in the amount of three times the damages sustained by the U.S. … because of the false claims and fraud alleged within this complaint, as the FCA, 31 U.S.C. §§ 3729, *et seq.* provides;

(b)    That civil penalties of $11,000 be imposed for each and every false claim that defendant presented to the United States;

(c)    That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)    That the Court grant permanent injunctive relief to prevent any recurrence of the FCA for which redress is sought in this complaint;

(e)    That the Relator be awarded the maximum amount allowed to him pursuant the FCA; and

(f)     That this Court award such other and further relief as it deems proper.

## COUNT EIGHT
## VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT -- CONSPIRACY TO SUBMIT FALSE CLAIMS. N.J.S.A. § 2A:32C-3(c)) BY THE DOCTORS AND ANDOVER

206.     Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

207.     Defendant Andover conspired and agreed with the Doctors to defraud Governmental Healthcare Programs as alleged in Count One and Count Two above.

208.     As a direct and proximate result of this conspiracy, U.S. and States have suffered damages and therefore are entitled to recovery as provided by the FCA in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such violation of the FCA.

WHEREFORE, Relator respectfully requests this Court to enter judgment against Defendants, as follows:

(a)     That the U.S. be awarded damages in the amount of three times the damages sustained by the U.S. … because of the false claims and fraud alleged within this complaint, as the FCA, 31 U.S.C. §§ 3729, *et seq*. provides;

(b)     That civil penalties of $11,000 be imposed for each and every false claim that defendant presented to the United States;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the FCA for which redress is sought in this complaint;

(e)     That the Relator be awarded the maximum amount allowed to him pursuant the FCA; and

(f)     That this Court award such other and further relief as it deems proper.

## COUNT NINE
## (VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT -- N.J.S.A. § 2A:32C-3(a)) BY ANDOVER

209.     Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

210.     Andover knowingly presented, or caused to be presented, false and fraudulent claims for services that were not eligible for reimbursement for State of New Jersey for Medicaid reimbursements in violation of N.J.S.A. § 2A:32C-3(a).

211.     Said false and fraudulent claims were presented by Andover with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

212.     The U.S. and States relied on these false and fraudulent claims, was ignorant of the truth regarding these claims, and would not have paid defendants for these false and fraudulent claims had it known the falsity of the said claims by Defendants.

213.     As a direct and proximate result of the false or fraudulent claims made by Andover, the State of New Jersey suffered damages and therefore is entitled to recover from Andover treble damages under the New Jersey False Claims Act, in an amount to be proved at trial, plus a civil penalty of not less than and not more than the civil penalty allowed under the New Jersey False Claims Act.

WHEREFORE, Relator respectfully requests this Court to enter judgment against

Defendants, as follows:

      (a)     That the U.S. be awarded damages in the amount of three times the damages sustained by the U.S. … because of the false claims and fraud alleged within this complaint, as the FCA, 31 U.S.C. §§ 3729, *et seq.* provides;

      (b)     That civil penalties of $11,000 be imposed for each and every false claim that defendant presented to the United States;

      (c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs and expenses which the Relator necessarily incurred in bringing and pressing this case;

      (d)     That the Court grant permanent injunctive relief to prevent any recurrence of the FCA for which redress is sought in this complaint;

      (e)     That the Relator be awarded the maximum amount allowed to him pursuant the FCA; and

      (f)     That this Court award such other and further relief as it deems proper.

**COUNT TEN**
**VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT -- N.J.S.A. § 2A:32C-3(b)) BY ANDOVER**

214.      Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

215.      Andover knowingly made, used or caused to be made or used, false records or false statements material to the foregoing false or fraudulent claims to get these false or fraudulent claims paid and approved by the State of New Jersey, in violation of N.J.S.A. § 2A:32C-3(b).

216.    Andover's knowingly false records or false statements that were material, and on information and belief continue to be material, to the false and fraudulent claims for payments they made to the State of New Jersey for Medicaid reimbursements and benefits.

217.    Andover's materially false records or false statements are set forth above and include, but are not limited to false claims and/or bills for payment that explicitly and/or impliedly attested that their customers were eligible to receive long term care services.

218.    These said false records or false statements were made, used or caused to be made or used, with Andover's actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

219.    As a direct and proximate result of these materially false records or false statements, and the related false or fraudulent claims made by Andover the State of New Jersey has suffered damages and therefore is entitled to recovery as provided by the New Jersey False Claims Act in an amount to be determined at trial, plus a civil penalty of not less than and not more than the civil penalty allowed under the New Jersey False Claims Act.


WHEREFORE, Relator respectfully requests this Court to enter judgment against  Defendants, as follows:


(a)    That the U.S. be awarded damages in the amount of three times the damages sustained by the U.S. … because of the false claims and fraud alleged within this complaint, as the FCA, 31 U.S.C. §§ 3729, *et seq*. provides;

(b)    That civil penalties of $11,000 be imposed for each and every false claim that defendant presented to the United States;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the FCA for which redress is sought in this complaint;

(e)     That the Relator be awarded the maximum amount allowed to him pursuant the FCA; and

(f)     That this Court award such other and further relief as it deems proper.

**COUNT ELEVEN**
**VIOLATION OF THE NEW YORK FALSE CLAIMS ACT --  2007 N.Y. Laws 58, Section 39, Article XIII § 189(a)**

220.     Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth.

221.     Andover, Dr. Kipiani and Dr. Jain knowingly presented, or caused to be presented, false and fraudulent claims for services that were not eligible for reimbursement for payment or approval to the Governmental Healthcare Programs in violation of New York False Claims Act, 2007 N.Y. Laws 58, Section 39, Article XIII § 189(a).

222.     Said false and fraudulent claims were presented by Andover with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

223.     The State of New York relied on these false and fraudulent claims, was ignorant of the truth regarding these claims, and would not have paid defendants for these false and fraudulent claims had it known the falsity of the said claims by Defendants.

224.     As a direct and proximate result of the false or fraudulent claims made by Andover, the State of New York suffered damages and therefore is entitled to recover

from Andover treble damages under the New York False Claims Act, in an amount to be

proved at trial, plus a civil penalty of not less than and not more than the civil penalty

allowed under the New York False Claims Act.

WHEREFORE, Relator respectfully requests this Court to enter judgment

against  Defendants, as follows:

To the STATE OF New York:
(1)    Three times the amount of actual damages which the State of New York has
sustained as a result of Defendant's conduct;
(2)    A civil penalty Relator incorporates by reference and re-alleges all paragraphs of
this Complaint set forth above as if fully set forth herein of not less than $5,000
and not more than $10,000 for each false claim which Defendant caused to be
presented to the State of New York;
(3)    Prejudgment interest; and
(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    The maximum amount allowed pursuant to 2007 N.Y. Laws 58, Section 39,
Article XIII, and/or any other applicable provision of law;
(2)    Reimbursement for reasonable expenses which Relator incurred in connection
with this action;
(3)    An award of reasonable attorneys' fees and costs; and
(4)    Such further relief as this Court deems equitable and just.

## COUNT TWELVE
## VIOLATION OF NEW YORK FALSE CLAIMS ACT, 2007 N.Y. Laws 58, Section 39, Article XIII § 189(b) BY ANDOVER

1.  Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth

    above as if fully set forth herein.

2.  Andover Dr. Kipiani and Dr. Jain knowingly presented, or caused to be presented, false

    and fraudulent claims for services that were not eligible for reimbursement for payment

or approval to the Governmental Healthcare Programs in violation of New York False

Claims Act, 2007 N.Y. Laws 58, Section 39, Article XIII § 189(b).

3.   Said false and fraudulent claims were presented by Andover with actual knowledge of

their falsity, or with reckless disregard or deliberate ignorance of whether or not they

were false.

4.   The State of New York relied on these false and fraudulent claims, was ignorant of the

truth regarding these claims, and would not have paid Defendants for these false and

fraudulent claims had it known the falsity of the said claims by Defendants.

5.   As a direct and proximate result of the false or fraudulent claims made by Andover,

the State of New York suffered damages and therefore is entitled to recover from

Andover treble damages under the New York False Claims Act, in an amount to be

proved at trial, plus a civil penalty of not less than and not more than the civil penalty

allowed under the New York False Claims Act.

WHEREFORE, Relator respectfully requests this Court to enter judgment against Defendants, as
follows:


To the STATE OF New York:
(1)    Three times the amount of actual damages which the State of New York
       has sustained as a result of Defendant's conduct;
(2)    A civil penalty Relator incorporates by reference and re-alleges all
       paragraphs of this Complaint set forth above as if fully set forth herein of
       not less than $5,000 and not more than $10,000 for each false claim which
Defendant caused to be presented to the State of New York;
(3)    Prejudgment interest; and
(4)    All costs incurred in bringing this action.

To RELATOR:
(1)    The maximum amount allowed pursuant to 2007 N.Y. Laws 58, Section
       39, Article XIII, and/or any other applicable provision of law;
(2)    Reimbursement for reasonable expenses which Relator incurred in
       connection with this action;

51

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.


## **<u>JURY DEMAND</u>**

Pursuant to Rule 38, Plaintiff demands a trial by jury on all Counts.




Respectfully submitted,

Dated:                                       <u>/s Bradford L. Geyer</u>
                                             Bradford L. Geyer, Esq
                                             GeyerGorey LLP
                                             PO Box 847
                                             Moorestown, NJ 08057
                                             Counsel for Relator