<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATES OF NEW JERSEY and NEW YORK, *ex rel.* KENNETH W. ARMSTRONG,<br><br>    Plaintiffs and Relator,<br><br>v.<br><br>ANDOVER SUBACUTE & REHAB CENTER SERVICES ONE, INC., *et al.*,<br><br>    Defendants. | Civil Action No. 12-3319 (SDW) (MAH)<br><br>**OPINION**<br><br><br>December 22, 2020 |

**WIGENTON**, District Judge.

Before this Court is Defendants Andover Subacute & Rehab Center Services One, Inc., Andover Subacute & Rehab Center Services Two, Inc. (collectively, "Andover Defendants"), and Estate of Dr. Hooshang Kipiani's (together with Andover Defendants, "Defendants") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56, as well as Relator Kenneth W. Armstrong's ("Relator") Cross-Motion for Partial Summary Judgment.  Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1367.  Venue is proper pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a).  This opinion is issued without oral argument pursuant to Rule 78.  For the reasons stated herein, Defendants' Motion is **GRANTED** and Relator's Motion is **DENIED**.

1

# I.   FACTUAL AND PROCEDURAL HISTORY

## A.

The Andover Defendants are former owners of two nursing homes in Andover, New Jersey ("Building One" and "Building Two"; together, "Andover").  (D.E. 129-1 ¶ 1.)[1]  During the relevant time period and until his death in October 2012, Dr. Hooshang Kipiani ("Dr. Kipiani") was the medical director and an attending physician at Andover.  (*Id.* ¶¶ 4–6.)[2]  This action arises from Relator's allegations that, from 2009 to 2012, the Andover Defendants and Dr. Kipiani fraudulently billed the United States and the States of New York and New Jersey for per diem services provided to Andover patients, even though Andover's physicians did not visit the patients as often as required by law.

The Andover Defendants did not submit claims for individual patient visits performed by doctors at their nursing homes, but they submitted claims for per diem services provided to Andover residents.  (*Id.* ¶¶ 51, 53.)  To submit claims to the relevant Medicare and Medicaid programs, the Andover Defendants entered into provider agreements that required them to comply with certain regulations set forth in 42 C.F.R. § 483, including a requirement that each nursing home resident be seen "by a physician at least once every 30 days for the first 90 days after admission and at least once every 60 days thereafter."[3, 4]  42 C.F.R. § 483.30(c)(1).  In order to be

---

[1] Record citations in this opinion are generally to Defendants' Statement of Material Facts Not in Dispute (D.E. 124-3), Relator's Response to Defendants' Statement of Undisputed Material Facts (D.E. 129-1), Relator's Statement of Undisputed Material Facts (D.E. 129-2), and Defendants' Response to Relator's Statement of Undisputed Material Facts (D.E. 139-1), as well as the record citations contained therein.

[2] Dr. Boris Freyman ("Dr. Freyman") and Dr. Sanjay Jain ("Dr. Jain") were also attending physicians at Andover during the relevant times.  (*See* D.E. 124-1 at 2.)  Dr. Freyman is no longer a defendant in this action.  (D.E. 15.)  Dr. Jain remains a defendant but has not joined Defendants' motion.

[3] These physician visits were required to be face-to-face.  *See* Department of Health & Human Services - Centers for Medicare and Medicaid Services, Appendix PP State Operations Manual, § 483.30(c).

[4] Under applicable New Jersey regulations, Andover was required to have a doctor or advanced practice nurse examine its patients at least once every 30 days.  *See* N.J.A.C. 8:39-23.2(d) ("A physician or advanced practice nurse shall visit each resident at least every 30 days unless the medical record contains an explicit justification for not doing so.

paid for the per diem services, the Andover Defendants also included with each reimbursement claim a certification verifying that they were furnishing accurate information and that the services were provided in accordance with applicable regulations.  (D.E. 129-1 ¶ 55.)[5]  Relator alleges that these certifications were false because Andover's physicians did not visit its patients at the legally prescribed minimum intervals.  The following events preceded the instant suit.

### B.

Andover hired Relator, a retired police officer, in August 2002 as a patient advocate.  (*Id.* ¶¶ 8–13.)[6]  In this role, he frequently communicated with patients and considered it part of his job to make sure that the patients' needs were met.  (*Id.* ¶¶ 21, 22.)  As part of his responsibilities, Relator received investigation reports of incidents and issues involving Andover patients.  (*Id.* ¶ 23.)  Relator would log the reports, interview the patients and staff involved, review the relevant documents, write reports, and, when appropriate, forward the reports to Andover administrators, the New Jersey Ombudsman, the New Jersey Department of Health, or the Andover Township police.  (*Id.* ¶¶ 24, 25.)  Relator sent any reports involving significant injury to the New Jersey Ombudsman, and representatives from the Ombudsman's office would subsequently visit Andover to investigate, including meeting with Relator in private to ask questions.  (*Id.* ¶¶ 26–29.)

---

Following the initial visit, alternate 30-day visits may be delegated by a physician to a New Jersey licensed physician assistant. . . .").

[5] For example, for reimbursement from New Jersey Medicaid, the Andover Defendants submitted a Provider Certification Statement that included:

> I certify that the foregoing information is true, accurate and complete . . . . I also certify that for each Medicaid patient, a physician has established/revised a written plan of care and certified/recertified, in writing, the need for nursing care in accordance with N.J.A.C. 10.61-1.5. I further certify that . . . the services covered by this claim and the amount charged therefore are in accordance with the regulations of the New Jersey Medicaid program.

(D.E. 129-1 ¶ 55 (capitalization omitted).)

[6] Beginning in 2007, Relator took on additional roles as Andover's safety officer and director of security.  (D.E. 129-1 ¶¶ 14–16.)

Relator testified during his deposition that he received reports from patients, whom he could not specifically recall, that they were not being visited by a doctor. (*Id.* ¶ 31.) Nonetheless, he "really didn't do anything" about the reports. (*Id.* ¶ 32.) According to Relator, he averaged about 1,100 to 1,200 investigations per year and authored thousands of investigation reports, but Dr. Kipiani's alleged conduct was a "very low security priority." (D. E. 139-1 ¶¶ 91, 93.) Relator therefore did not report to the Ombudsman's office or to the other authorities that Andover's doctors were not visiting patients with the required frequency. (D.E. 129-1 ¶ 30.) Andover terminated Relator's employment in 2012. (*Id.* ¶ 34.)

Relator's witness Colleen Baxter worked at Andover from 1991 to 2012 in various positions, including as quality assurance director from 1999 to 2012. (*Id.* ¶ 36.) Ms. Baxter shared an office with Relator in Building Two from 2001 to 2011, and her job responsibilities as quality assurance director were limited to Building Two. (*Id.* ¶¶ 18, 19, 38, 39.) These job responsibilities included establishing plans to address deficiencies at the facility and investigating patient falls. (*Id.* ¶ 38.) Ms. Baxter occasionally met with state inspectors to discuss patient falls and incident reports, and she had opportunities at these meetings to inform the inspectors of any concerns regarding patient care. (*Id.* ¶¶ 40, 41.) However, she never informed the inspectors of any concerns regarding the frequency of physician patient visits. (*Id.* ¶ 41.) Andover terminated Ms. Baxter's employment on August 15, 2012. (*Id.* ¶ 44.)[7]

Relator, Ms. Baxter, and three other witnesses—Nurse Donna Smith, Nurse Ann Drake, and clerical worker Arnetta Williams, all of whom worked in Building Two during the relevant time period—submitted declarations in this action stating that Dr. Kipiani typically came to

---

[7] On September 9, 2012, Relator and Ms. Baxter executed an agreement under which she will receive 15% of any eventual recovery by Relator in this action. (D.E. 129-1 ¶ 46.)

Andover only a few times per week, staying a few hours per visit.  (D.E. 139-1 ¶¶ 67–73, 81.)
They also stated that it was common knowledge among the nursing staff that Dr. Kipiani often
wrote in patients' charts without performing the required patient visits.  (*Id.* ¶ 85.)  Nurse Smith,
Ms. Baxter, and Relator additionally stated that they never saw Dr. Kipiani in a patient room
directly attending to a patient.  (*Id.* ¶¶ 82, 86, 87.)  However, both Relator and Ms. Baxter admitted
during their depositions that, as they were based in Building Two, they did not know or could not
know whether Dr. Kipiani visited patients in Building One.  (D.E. 129-1 ¶ 42; D.E. 139-1 ¶ 87.)

Only two witnesses, Ms. Baxter and Ms. Williams, named specific patients at all.  Although
Ms. Baxter identified 15 patients that she believed were Dr. Kipiani's patients, she did not specify
whether or not Dr. Kipiani visited those 15 patients.  (*See* D.E. 139-1 ¶ 64; D.E. 129-5 at 97–99.)
Ms. Williams listed 21 patients that she believed "were not being seen by Dr. Kipiani," though she
did qualify that he saw patients when they asked to see him and during medical emergencies.  (D.E.
129-6 at 4–5.)  However, three other Andover nurses—Sharon Skidmore, Rita Malones, and Sonia
Velamonte—submitted declarations stating that Dr. Kipiani regularly conducted patient visits and
that they accompanied him on those visits.  (D.E. 139-1 ¶ 79.)

C.

Relator filed this lawsuit on June 1, 2012, shortly after his termination, as a *qui tam* relator
on behalf of the United States and the States of New Jersey and New York.  (D.E. 1.)  The United
States applied for an Order staying the action so that it could decide whether to intervene, and the
case was administratively terminated on September 30, 2013.  (D.E. 8, 9.)  The Andover
Defendants continued to submit per diem claims to the Government from 2012 through 2015, and
the Government continued to pay those claims.  (DE. 129-1 ¶ 57.)  In June 2017, the United States
intervened with respect to defendant Dr. Boris Freyman but declined to intervene as to the other

defendants.  (D.E. 13.)  This Court reopened the case in September 2017, and Relator filed a

Second Amended Complaint in March 2019, alleging violations of the Federal False Claims Act

("FCA") (Counts I–V), the New Jersey False Claims Act ("NJFCA"), N.J.S.A. § 2A:32c-3(a)-(c)

(Counts VI–X), and the New York False Claims Act ("NYFCA"), N.Y. State. Fin. Law § 189(a)-

(b) (Counts XI and XII).[8]  (D.E. 17, 70.)  Following discovery, Defendants and Relator filed their

Motions for Summary Judgment and briefing was timely completed.  (D.E. 124, 129, 139.)

## II.   <u>LEGAL STANDARD</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  The "mere existence of some alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that there be no

genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A

fact is only "material" for purposes of a summary judgment motion if a dispute over that fact

"might affect the outcome of the suit under the governing law."  *Id.* at 248.  A dispute about a

---

[8] This Court granted-in-part and denied-in-part Defendants' Motion to Dismiss the Second Amended Complaint on September 26, 2019.  (D.E. 108, 109.)  The deadline for Defendants' Answer under Rule 12(a)(4)(A) was therefore October 10, 2019.  Defendants' counsel sent a Proposed Answer to Relator's counsel on June 28, 2019, but neglected to file an Answer until June 29, 2020, one day after Relator's counsel informed Defendants' counsel of the oversight.  (*See* D.E. 139 at 3–4.)  Under Rule 6(b)(1)(B), this Court "may, for good cause, extend the time [to act] . . . on motion made after the time has expired if the party failed to act because of excusable neglect."  To determine whether a party failed to act because of excusable neglect, courts "must consider all relevant circumstances surrounding the party's omission," including "(1) the danger of prejudice, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the movant acted in good faith."  *Drippe v. Tobelinski*, 604 F.3d 778, 785 (3d Cir. 2010) (quotation and punctuation omitted) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs.*, 507 U.S. 380, 395 (1993)).

Here, there is no prejudice to Relator as he has been in possession of Defendants' substantially similar Proposed Answer for more than a year, and he did not raise the lack of an Answer prior to filing his opposition to Defendants' Motion for Summary Judgment.  Although Defendants delayed for more than nine months, admitting the Answer now will not delay judicial proceedings.  Finally, this Court finds no reason to believe that Defendants acted in bad faith and credits their explanation that the oversight was inadvertent and the result of the responsible junior associate's health issues.  (D.E. 139 at 3–4.)  This Court will therefore grant Defendants leave to late-file their Answer pursuant to Rule 6(b), deem the Answer filed, and decide the instant motions on the merits.  *See Ruhle v. Hous. Auth. of City of Pittsburgh*, 54 Fed. Appx. 61, 62 n.1 (3d Cir. 2002) ("Entry of default is generally disfavored and we have long indicated our preference that cases be decided on the merits." (citation omitted)).

material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations, unsupported assertions or denials of its pleadings. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). Further, the nonmoving party is required to "point to concrete evidence in the record which supports each essential element of its case." *Black Car Assistance Corp. v. New Jersey*, 351 F. Supp. 2d 284, 286 (D.N.J. 2004). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof[,]" then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322-23. Furthermore, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate

the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The nonmoving party cannot defeat summary judgment simply by asserting that certain evidence submitted by the moving party is not credible. *S.E.C. v. Antar*, 44 F. App'x 548, 554 (3d Cir. 2002).

## III.   **DISCUSSION**

The FCA "prohibits the submission of false or fraudulent claims for payment to the United States and authorizes *qui tam* actions, by which private individuals may bring a lawsuit on behalf of the government." *Foglia v. Renal Ventures Mgmt., LLC*, 830 F. Supp. 2d 8, 14 (D.N.J. 2011) (citing *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 131 S. Ct. 1885, 1889 (2011)) (other citation omitted). To establish a *prima facie* FCA violation under 31 U.S.C. § 3729(a)(1), a plaintiff must prove that: "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 304–05 (3d Cir. 2011) (quotation and citations omitted), *abrogated on other grounds*, *Universal Health Serv., Inc. v. United States*, 136 S. Ct. 1989 (2016) ("*Escobar*").[9]

"There are two categories of false claims under the FCA: a factually false claim and a legally false claim." *Wilkins*, 659 F.3d at 305 (citation omitted). "A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government and a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment." *Id.* (citation

---

[9] The NJFCA and NYFCA mirror the FCA and require the same showings. *See United States v. Loving Care Agency, Inc.*, 226 F. Supp. 3d 357, 363–64 (D.N.J. 2016) ("The language in the NJFCA is nearly identical to the federal statute and thus requires the same showings . . . ." (citations omitted)); *United States v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 286 (E.D.N.Y. 2016) (stating that "[t]he NYFCA is closely modeled on the federal FCA" and that "it is appropriate to look toward federal law when interpreting the New York act" (quotations and citations omitted)).

omitted).[10]  For legally false claims, "[a] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable."  *Escobar*, 136 S. Ct. at 1996; *see United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 760 (3d Cir. 2017).  For the FCA, a regulation is "material" if compliance with it has a "natural tendency to influence, or [is] capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

Here, Relator alleges that Defendants submitted legally false claims to the Government. (*See* D.E. 129-3 at 19 n.16.)  Defendants move for summary judgment on the bases that (1) Relator has failed to produce sufficient evidence of false claims and (2) the regulations that Defendants allegedly violated were not material to the Government's payment decisions.  (D.E. 124-1 at 5–19, D.E. 139 at 7–13.) Relator moves for partial summary judgment that the identified regulations were material.  (D.E. 129-3 at 18–25.)  Both sides move for summary judgment on the issue of materiality, and this Court will therefore address that issue first.

A.    **Materiality**

The FCA "is not an all-purpose antifraud statute."  *Escobar*, 136 S. Ct. at 2003 (quotation and citation omitted). "A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act."  *Id.* at 1996.  However, "a misrepresentation is not material 'merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment . . .  [or because] the Government would have

---

[10] Legally false claims may be express or implied.  *See Wilkins*, 659 F.3d at 305.  "Under the 'express false certification' theory, an entity is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds."  *Id.* (citation omitted).  Under the "implied false certification" theory, an entity is liable if it "makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment."  *Id.* (citation omitted).

the option to decline to pay if it knew of the defendant's noncompliance.'" *United States ex rel.*

*Petratos v. Genentech Inc.*, 855 F.3d 481, 489 (3d Cir. 2017) (quoting *Escobar*, 136 S. Ct. at 2003).

Instead, "materiality look[s] to the effect on the likely or actual behavior of the recipient of the

alleged misrepresentation." *Escobar*, 136 S. Ct. at 2002 (quotation omitted).   The standard is

"rigorous" and "demanding." *Id.* at 2002, 2004 n.6.

Here, notably, Relator does not allege (and has not presented evidence) that Defendants

submitted claims to the Government for physician visits that did not occur.  (*See* D.E. 129-1 ¶ 53.)

Instead, Relator alleges that, when they signed provider agreements and submitted per diem claims

for Andover residents, Defendants falsely certified that they were complying with applicable

Medicaid regulations while in fact they were not complying with regulations governing the

frequency of physician visits for those patients.  (D.E. 129-3 at 13–14.)[11]  However, Relator has

not submitted any cases in which courts found regulations regarding the frequency of physician

visits to be material to the Government's payment decision, nor has Relator submitted any other

evidence that the Government has denied payment in the past to nursing homes for noncompliance

with these regulations.

Instead, the record before this Court supports a finding that noncompliance with the

regulations at issue would not have been material to the Government's payment decision.  Relator

filed this lawsuit in June 2012 and presumably served the Government with "[a] copy of the

complaint and written disclosure of substantially all material evidence and information [he]

possesse[d]."  31 U.S.C. § 3730(b)(2).  However, the Government chose not to intervene with

---

[11] 42 C.F.R. § 483.10(f)(11)(i) sets forth categories of services that the Andover Defendants were required to provide to residents, and for which Defendants billed the Government on a per diem basis (*e.g.*, nursing services, food, activities, room maintenance, hygiene items, and certain social and hospice services).  These services must be charged to Medicare or Medicaid and cannot be charged to a nursing home resident.  *See id.*  The statutory list does not include physician visits and Relator does not allege that these categories of services were not provided.

respect to Defendants and, instead, the Government continued paying Defendants' per diem claims from 2012 through 2015.  (DE. 129-1 ¶ 57.)  As the Third Circuit has held, "[b]ecause the False Claims Act was passed to protect the federal treasury, and since the Government decides on payment, it is the Government's materiality decision that ultimately matters." *Petratos*, 855 F.3d at 492 (internal citations omitted).  "[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Escobar*, 136 S. Ct. at 2003.

That is why, "[p]ost-*Escobar*, numerous federal courts have found insufficient FCA materiality where the government investigated a relator's allegations but chose not to intervene or otherwise address the defendant's allegedly improper behavior." *Polansky v. Exec. Health Res., Inc.*, 422 F. Supp. 3d 916, 938 (E.D. Pa. 2019) (collecting cases); *see, e.g.*, *Petratos*, 855 F.3d at 490; *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016) (affirming summary judgment based on lack of materiality where the Government investigated the alleged noncompliance and "concluded that neither administrative penalties nor termination was warranted"); *United States ex rel. Cressman v. Solid Waste Servs.*, Civ. No. 13-5693, 2018 WL 1693349, at *6 (E.D. Pa. Apr. 6, 2018) (granting summary judgment in favor of defendant where the Government's "declination to intervene or take any action against [d]efendant support[ed] the conclusion that it d[id] not consider the regulatory violation or failure to disclose asserted by [p]laintiff to be 'material'").

When this Court largely denied Defendants' Motion to Dismiss in 2019, it noted that the Government's continued payments to Andover Defendants after Relator filed his complaint did not negate materiality because the complaint did not "allege that the Government continued to pay the claims *knowing* that the physicians were not supervising their patients as required."  (D.E. 108

at 11 n.16.)  This Court further noted that "[w]hether the Government continued to pay such claims without requiring a restatement or revision or taking other regulatory action is a matter for summary judgment or trial."  (*Id.* (quotation and punctuation omitted) (citing *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 906–07 (9th Cir. 2017); *United States ex rel. Streck v. Bristol-Myers Squibb Co.*, Civ. No. 13-7547, 2018 WL 6300578, at *16–17 (E.D. Pa. Nov. 29, 2018), *clarified on denial of reconsideration*, 370 F. Supp. 3d 491 (E.D. Pa. 2019)).)  Now, having arrived at the summary judgment stage, the record before this Court does not contain evidence that the Government took any action against Defendants following service of Relator's complaint.  The Government's continued payments therefore support a conclusion of non-materiality.[12, 13]

Because the Government's conduct in this case precludes a reasonable jury from finding that Relator's allegations, if proven, would have been material to the Government's decision to make per diem payments to the Andover Defendants, this Court will grant Defendants' Motion for Summary Judgment on the issue.

### B.     Specificity

Even if the allegedly violated regulations were material, this Court would still grant Defendants' Motion for Summary Judgment because Relator has not produced evidence of specific false claims submitted for payment.  Relator argues that his expert "identified 927 specific per

---

[12] Additionally, data from the Department of Health and Human Services's Centers for Medicare and Medicaid Services ("CMS") show that, from 2009 to 2012, CMS imposed 142 enforcement remedies at nursing home facilities in New Jersey.  *See* CMS, *Public Release of Nursing Home Enforcement Information Announcement* 17 (June 3, 2016).  In the vast majority of cases, the enforcement remedy that CMS imposed was a fine, *see id.*, and the alleged noncompliance in the instant case is not so egregious to suggest that CMS would treat it differently.

[13] This Court further notes that even Relator and Ms. Baxter did not think that the alleged lack of physician visits was worth reporting to the appropriate authorities while they worked at Andover as a patient advocate and quality assurance director, respectively.  As discussed above, Relator testified during his deposition that he received reports from patients that they were not being visited by a doctor, but he "really didn't do anything" about the reports, despite multiple opportunities to do so.  (*See* D.E. 129-1 ¶¶ 26–32, 40, 41.)  Although Relator claimed that he conducted more than 1,000 investigations per year and that he authored thousands of investigation reports, he admittedly viewed Dr. Kipiani's alleged conduct as a "very low security priority."  (D. E. 139-1 ¶¶ 91, 93.)

diem claims submitted by Andover" in connection with Dr. Kipiani under one methodology (and "1,222 per diem claims" under another) and offers this as "the specific false per diem claims submitted by Andover." (D.E. 129-3 at 11–12.) However, Relator has not submitted sufficient evidence that each and every claim connected to Dr. Kipiani between 2009 and 2012 was false. Only one witness, Arnetta Williams, submitted names of patients that Dr. Kipiani was responsible for seeing and allegedly did not see, and even this witness admitted that Dr. Kipiani saw patients when they requested to see him and in medical emergencies.[14] (*See* D.E. 129-6 at 4–5.) None of the submitted evidence could lead a reasonable juror to conclude that Dr. Kipiani did not see a single patient from 2009 to 2012 and that every per diem claim submitted in connection with his patients during that period was therefore fraudulent.

It is not enough to "merely describe a private scheme in detail but then allege that claims requesting illegal payments must have been submitted, were likely submitted, or should have been submitted to the Government." *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 98 (3d Cir. 2018) (quotation and punctuation omitted) (rejecting relator's argument that defendant "necessarily violated the False Claims Act because all of its 24 claims incorrectly certified that it did not pay any illegal kickbacks"); *see United States ex rel. Booker v. Pfizer, Inc.*, 847 F.3d 52, 58 (1st Cir. 2017) (affirming summary judgment because "[a]fter six years of litigation, relators' only proffered evidence of actual false claims was aggregate data reflecting the amount of money expended by Medicaid for . . . prescriptions . . . between January 2008 and March 2012"). But that is exactly what Relator has done here and this Court will therefore grant Defendants' Motion for Summary Judgment on this basis as well.

---

[14] As discussed above, Colleen Baxter only *identified* 15 patients that she believed were Dr. Kipiani's patients; she did not state whether or not he ever saw those patients. (*See* D.E. 139-1 ¶ 64; D.E. 129-5 at 97–99.)

**CONCLUSION**

For the reasons set forth above, Defendants' Motion for Summary Judgment is **GRANTED** and Relator's Cross-Motion for Partial Summary Judgment is **DENIED**.  An appropriate order follows.

/s/ Susan D. Wigenton
**SUSAN D. WIGENTON, U.S.D.J.**

Orig:       Clerk
cc:         Michael A. Hammer, U.S.M.J.
            Parties